UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 19-mj-03536-Goodman

IN RE CRIMINAL COMPLAINT
FOR ALVARO COBAR BUSTAMANTE,
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____
WALTER M. NORKIN
Assistant United States Attorney
Southern District of Florida
Court ID No. A5502189
99 Northeast 4th Street, 6th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9409
E-mail: walter.norkin@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>ALVARO ESTUARDO COBAR BUSTAMANTE<br><br>*Defendant(s)* | )<br>)  Case No. 19-mj-03536-Goodman<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __January 2015 to the present date__ in the county of _____Miami-Dade_____ in the __Southern__ District of __Florida and elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 1656(h) | The defendant, together with others, did knowingly and willfully combine, conspire, confederate and agree with other persons to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be proceeds of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(3)(B) |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

S.A. Paul West, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___09/25/2019___

_____
*Judge's signature*

City and state:  ____Miami, Florida____   U.S. MAGISTRATE JUDGE JONATHAN GOODMAN
*Printed name and title*

# AFFIDAVIT

I, PAUL J. WEST, Special Agent with the Federal Bureau of Investigation (FBI), having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1. I submit this application in furtherance of an investigation worked by FBI with the United States Drug Enforcement Administration (DEA).

2. As a Special Agent with FBI, I perform the duties provided by law and regulation, and I am empowered to conduct investigations of offenses against the United States.

3. I have been employed as a Special Agent with FBI since approximately January 2008. As a Special Agent, I am responsible for investigations of offenses under Titles 18 and 21 of the United States Code, including those that focus on unlawful money laundering and other financial crimes. I am currently assigned to a squad that is responsible for conducting investigations that target International Drug Trafficking Organizations. Since October of 2008, I have been working on federal narcotics investigations and have participated in several investigations which led to the arrest and conviction of narcotics distributors. Since 2008, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the manufacturing, importation, and distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies, as well as the methods in which the payment and laundering of illicit proceeds are conducted. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting

1

and conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification systems data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to the substantial seizures of narcotics, money, firearms, and other contraband.

4. This affidavit is made in support of a criminal complaint charging Alvaro Estuardo COBAR BUSTAMANTE (hereinafter "COBAR") with conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(3)(B).

5. Although I am familiar with the full breadth of the facts and circumstances of this investigation, I have not included in the affidavit each and every fact known to me, but only those facts and circumstances that I believe are sufficient to establish probable cause.

6. The statements contained in this affidavit are based on my investigation, information provided by others, and on my experience and training as a federal agent and that of other agents participating in the investigation, including agents of the DEA.

## PROBABLE CAUSE

### I. Background of the Investigation

7. In 2013, the FBI and DEA were investigating multiple Drug Trafficking Organizations (DTOs) entrenched in Guatemala. Guatemala is a strategically important country for large-scale DTOs because it is a trans-shipment point for a cocaine trafficking pipeline that goes from Colombia to Mexico, before branching off to various locations within the United States. Cocaine that originates in Colombia is often transported to Guatemala before it is re-sold or moved further north into Mexico, where cartels are charged with importing the cocaine into the U.S. Thus, Colombian and Mexican organizations, hoping to minimize exposure to U.S. law enforcement,

2

buy and sell multi-ton quantities of cocaine in Guatemala and this, in turn, creates a market place of opportunities for Guatemalan DTOs, who act as middle-men receiving and re-selling multi-ton quantities of cocaine.

8. Through my experience, I have learned the corruption of local and federal public officials is paramount to the success of international DTOs operating in Mexico, Central America, or South America. DTOs utilize bribery to detect and ultimately disrupt government operations targeting the DTO. Elected representatives throughout Central and South America control the appointment of key law enforcement officers who are responsible for enforcing the rule of law in rural territories coveted by DTOs smuggling contraband. DTOs are motivated to support electoral campaigns to ensure corruptible officials are gainfully employed throughout these territories. To that end, the aforementioned Guatemalan DTOs maintained control of smuggling routes by, among other things, routinely paying bribes to politicians and government officials on a local, state, and federal level. As a result, Guatemalan law enforcement did not interfere with on-going smuggling operations. These bribe payments extended to political candidates favored to gain election.

9. In addition to political corruption, the business community plays a role in either helping or preventing narcotics trafficking. As cocaine trafficking is a profit-driven crime, it is of supreme importance for DTOs to have the ability to move and launder money, both to reap the profits of their unlawful endeavors and to keep their criminal activities going. While the movement of money and money laundering can be achieved through unsophisticated means, the most successful DTOs find ways to enlist legitimate or seemingly legitimate businesses into their schemes. Banks in particular are prized targets of DTOs and the ability to move or launder money through a banking institution represents not only an achievement for a DTO but the pinnacle of

bad confluences – drug trafficking, corruption and bank involvement – that can seriously plague a country otherwise battling narcotics trafficking.

## II. The Identification and Investigation of COBAR as a Money Launderer for Narcotics Traffickers

### A. COBAR's Prior Money Laundering Activities

10. During the course of the investigation, agents debriefed a cooperating witness (hereinafter "CW1"), who has pled guilty to narcotics trafficking and is cooperating in the hopes of receiving a more lenient sentence. CW1 stated, in sum and substance, that CW1 knew COBAR to be a money launderer. More specifically, CW1 explained that after CW1 and COBAR became friends socially and COBAR learned that CW1 had a lot of friends in the narcotics business (and presumed, correctly, that CW1 was also a narcotics trafficker), COBAR confided to CW1 that COBAR could assist CW1 with clandestine money transactions. COBAR stated, in sum and substance, that he could buy and sell U.S. currency, set up credit cards with large prepaid limits, issue bank checks that did not name CW1, and move money through "mirror transactions" between Guatemala, Panama, Colombia, and Mexico.[1]

11. CW1 stated that, between 2015 and 2016, CW1 conducted multiple transactions with COBAR where CW1 provided U.S. dollars to COBAR and had him convert the money to a local currency or bank checks. CW1 added that each transaction was between approximately $100,000 to $200,000, that each transaction involved money that was the proceeds of narcotics transactions, and that CW1 needed the U.S. currency clandestinely turned into local currency so

---

[1] Based on my training, experience and knowledge of this investigation, I know that a "Mirror Exchange" is a form of black market currency transaction that takes place outside the ambit of banking institutions. In a mirror exchange, currency is delivered to an individual in one country and currency of an equal value is issued to an individual in a different country. The currency that is originally delivered does not actually move countries but is instead exchanged through an agreement between individuals who are part of the same underground money movement network.

4

that CW1 could use the large sums of money without arousing the suspicions of law enforcement. CW1 further stated that, due to the need for secrecy, CW1 dealt personally and only with COBAR, with CW1 personally providing the cash to COBAR and COBAR personally returning local currency or bank checks to CW1 without any kind of bank records created.

12. CW1 is also aware that COBAR provided similar money laundering services to other narcotics traffickers because CW1 witnessed others that CW1 knew were narcotics traffickers meeting in COBAR's office and behaving similarly to CW1. CW1 stated that, though COBAR and CW1 never explicitly discussed that CW1 was a narcotics trafficker nor that the money in the transactions was narcotics proceeds, COBAR must have known these facts to be true based on how COBAR proposed the services, COBAR's interactions with other traffickers, and the secrecy with which COBAR and CW1 engaged in their transactions.

13. Agents also debriefed another cooperating witness ("CW2") who, similar to CW1, pled guilty to narcotics trafficking and is cooperating in the hopes of receiving a more lenient sentence. CW2 stated, in sum and substance, that on multiple occasions in or about 2017 and 2018, CW2 utilized COBAR to move narcotics trafficking proceeds in a clandestine way in order for CW2 to be able to continue drug trafficking. CW2 explained that, as part of drug trafficking operations, it was necessary to move bulk cash from Central America to South America. The cash was the proceeds of narcotics trafficking and the movement was done to pay other traffickers who had supplied hundreds of kilograms of cocaine or otherwise assisted in dispatching it north to Central America, as well as to support those traffickers in the planning and coordination of additional future shipments of cocaine. Furthermore, it was necessary to move the money in a way that hid the fact that it was proceeds of illegal activity, and to conceal the true identities of the sending and receiving persons. COBAR, as a banker, was able to provide the service, taking the

cash in Guatemala and having it delivered to individuals in South America. CW2 stated that COBAR was aware that CW2 was a narcotics trafficker and that the cash was proceeds of narcotics trafficking because CW2 talked openly to other narcotics co-conspirators about their ongoing drug activities in front of COBAR and CW2 and COBAR had conversations about the need to move the money in a clandestine way without creating a paper trail. Indeed, it was because COBAR was aware that he was providing a service to narcotics traffickers that COBAR was able to charge a high percentage – 17 percent of the total value of the currency – to move the money.

14. As part of CW2's drug trafficking operations, CW2 maintained a computerized ledger detailing, among other things, the movement of money that supported his drug operations. CW2 furnished the ledger to agents. The ledger showed dates that money was provided to COBAR, as well as sums that were moved and the fees that were charged for the movement. The ledger, which specifically listed "Cobar" or "cobar" on multiple occasions, confirmed CW2's statements about providing COBAR with $1 million in U.S. currency, as well as COBAR charging CW2 a fee of 17 percent of the total amount to move the money.

**B.  COBAR's Current Money Laundering Activities**

15. During the course of the investigation, agents also debriefed a third cooperating witness (hereinafter "CW3"). CW3 pled guilty to money laundering (with narcotics trafficking as the underlying crime) and is cooperating in the hopes of receiving a more lenient sentence. CW3 stated, in sum and substance, that CW3 personally knew COBAR and was aware that COBAR engaged in money laundering activities. CW3 explained, in sum and substance, that CW3 first met COBAR in approximately 2017 and COBAR noted to CW3 shortly after their initial introduction that COBAR had the ability to receive large amounts of cash and place it into the banking system in a way that avoided certain banking "controls," regulations and reporting

requirements, as well as to store large amounts of cash. CW3 further explained that COBAR's comments indicated that COBAR believed that CW3 had a large amount of cash from unlawful sources and CW3 understood COBAR to be making an offer to assist in laundering that illicit cash.

16. At the direction of FBI agents, in or about early 2019, CW3 began to record the interactions with COBAR. On or about January 30, 2019, COBAR communicated with CW3 by text messages via WhatsApp. In coded language in that conversation, CW3 asked COBAR to assist in clandestinely moving cash from Guatemala to the U.S. More specifically, CW3 asked COBAR to help CW3 figure out a way to "transfer it [cash] from there [Guatemala]" to "here [the U.S.]"[2] COBAR asked if the money was located in the same place where COBAR was located, namely Guatemala, which CW3 affirmed and added that "all commissions will be paid" for COBAR's assistance in secretly moving the money. Later in the conversation, COBAR suggested he would contact CW3 via another method of communication (not WhatsApp), and CW3 responded that an in-person discussion in Miami, Florida would be better due to "security concerns."

17. On or about February 12, 2019, CW3 met with COBAR in Miami, Florida. The meeting was video and audio recorded. The video clearly showed COBAR's face during portions of his interaction with CW3. During their meeting, CW3 and COBAR again discussed the need for CW3 to get cash from Guatemala to the U.S., and specifically the need for the cash to be moved secretly to the U.S. CW3 and COBAR then discussed the various ways that could be accomplished.

---

[2] All conversations quoted in this affidavit are based on draft transcriptions and draft Spanish-to-English translations. The final, court-certified transcriptions and translations may be slightly different than the quotes that appear here. However, based on my training, experience and knowledge of this investigation, I believe that the substance of the conversations conveyed in this affidavit are accurate, even if the final versions of the transcriptions and translations may be slightly different.

7

18. On or about March 29, 2019, CW3 and COBAR engaged in a telephone call. That conversation was recorded. During the call, CW3 and COBAR further discussed, among other things, their plan to clandestinely launder illegal proceeds and move them from Guatemala to the U.S. More specifically, CW3 stated, "I am going to send a friend to the office," and reiterated the importance of secrecy because that friend "is doing me the favor." CW3 added, "and they don't ask you for papers or anything[,]" to which COBAR confirmed "No, no, no, not at all." CW3 then explained that this "friend" would drop off money was the proceeds of illegal activities: "That's what I wanted to entrust you with, because, the money that, that, that, that they gave me, he's . . . he's a friend, right? But he's not in good things, right? You understand, right?" COBAR laughed at that point, and CW3 continued, "He [the friend] engages in other things, let's say bad, but he engages in another type of thing . . . so he offered to give me support, and he's giving me support, but he doesn't, but he doesn't want to be asked for an address, papers or stuff, right?" COBAR assured CW3 there would not be any problems with that plan. CW3 confirmed, "And he [the friend] won't sign anything as received, right?" to which COBAR responded, "No, no . . . ." CW3 expressed relief: "Yes. Because of what, what he [the friend] engages in, right?" and later added, "he's doing me the favor . . . and he said to me, 'with pleasure, but I don't want to be asked to signed anything there, you know?' because, because of the same things that, that he's engaged in." CW3 and COBAR then discussed the special treatment that "the friend" would receive when he came to drop off the money, including only meeting with COBAR or COBAR's trusted associate. Thereafter CW3 again highlighted the importance of maintaining secrecy, stating, "the most important thing . . . is that it's with total confidentiality." COBAR agreed, "Of course. We'll take care of that."

19. On or about April 9, 2019, a fourth cooperating witness (hereinafter "CW4") met with COBAR in his bank office in Guatemala City, Guatemala. CW4 has been charged with narcotics trafficking, has admitted during debriefs to having engaged in narcotics trafficking as charged, and is cooperating in the hopes of receiving a more lenient sentence. CW4 and CW3 do not know each other. Rather, CW4 was directed by FBI to meet with COBAR and to drop off money with him (consistent with the plan COBAR had made with CW3).

20. Prior to CW4's meeting with COBAR, on that same day, CW4 met with FBI agents. FBI agents confirmed that CW4 had no money on him other than petty cash of the local Guatemalan currency. FBI agents also outfitted CW4 with a video and audio recording device, and provided CW4 with approximately $20,000 in U.S. currency, which currency was photographed and otherwise documented by agents. Thereafter, FBI agents instructed CW4 to proceed to a certain bank branch office, ask for COBAR, and drop off the cash without producing any identification or signing any documents – essentially, for CW4 to play the role of the narcotics trafficker that CW4 was and drop off the money as if it were proceeds of narcotics trafficking that CW4 wanted to be moved clandestinely.

21. Thus, on or about April 9, 2019, CW4 did as instructed and CW4's interactions with COBAR were video and audio recorded. CW4 went to the bank and asked for COBAR. When the receptionist asked for CW4's name, CW4 provided a false name and produced no identification. CW4 was eventually led to COBAR's office, where the door was closed and CW4 and COBAR were alone. The video clearly showed COBAR's face during portions of his interaction with CW4. During their conversation, CW4 stated to COBAR, "I have a little order there for you, from 'Manuel'," to which COBAR replied, "Did you count it?" CW4 answered affirmatively and asked, "Shall I pass it to you?" COBAR similarly responded affirmatively.

9

COBAR then is observed on the video receiving the package and counting the $20,000 in U.S. currency.[3]

22.　　While COBAR was counting the money, CW4 inquired whether COBAR could assist in additional money laundering transactions, stating, "So, is there a way . . . can you do another transfer for me, another couple of transfers?" COBAR responded, "to where? The same place [the U.S.]?" CW4 stated, "Yes, to the same place[,]" to which COBAR replied, "Yes. For how much?" CW4 answered, "They'd be for twenty-five [thousand], twenty, twenty-five" and explained it would need to be done "weekly." COBAR stated, "Yes, I think so. Did you bring any now?" CW4 noted that COBAR just received "twenty" but that CW4 would need a "special," meaning confidential, way to contact COBAR for future laundering, explaining that the future U.S. money movements could involve "small bills," unlike the $50 bills CW4 just provided. COBAR suggested a solution: "next time," there was another location where they could meet that would be even "more private." CW4 expressed gratitude for that idea, as less people would see CW4 coming in; but COBAR stated that, even if people saw CW4, CW4 could explain it away, "at the end it's that you're coming to talk with me for credit or something." CW4 reacted positively to that statement and asked COBAR to write down his telephone number because CW4 was not in possession of a cellular telephone, as CW4 needed to "toss" mobile telephones "very, very frequently." COBAR repeated, "you change your number very frequently?" and CW4 affirmed, "very frequently." Thereafter, COBAR wrote down his telephone number, noting "this is the personal one," and handed the paper to CW4. CW4 and COBAR then concluded their interaction,

---

[3] Based on my training, experience and knowledge of this investigation, COBAR's unhesitating acceptance of a large amount of U.S. currency is yet another indication that he is aware the money is proceeds of not only unlawful activity but also specifically of narcotics trafficking, as there are few other reasons for why an individual in Guatemala would be in possession of a large amount of U.S. currency.

10

with CW4 asking if they should meet "next time" at the other more private location and COBAR instructing CW4 to contact him via the "chats" on the provided telephone number to confirm the next meeting, closing with "We're set then."

23. Immediately after the meeting with COBAR, CW4 left the bank and met again with FBI agents. CW4 provided to agents the paper with COBAR's telephone number, which agents retained along with the recording from CW4's meeting with COBAR.

## CONCLUSION

Based upon the information provided above, I respectfully submit that probable cause exists to believe that from in or around January 2015 and continuing to the present, Alvaro Estuardo COBAR BUSTAMANTE, and others conspired to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be proceeds of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(3)(B).

Respectfully submitted,

_____
PAUL J. WEST, SPECIAL AGENT,
FEDERAL BUREAU OF INVESTIGATION

Sworn and subscribed before me
this 25th day of September, 2019.

_____
THE HON. JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 19-mj-03536-Goodman

### BOND RECOMMENDATION

DEFENDANT: Alvaro Estuardo Cobar Bustamante

___Detention___
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA: WALTER M. NORKIN

Last Known Address: _____
Guatemala

What Facility:

Agent(s): Paul West, FBI
**(FBI)** (SECRET SERVICE) (DEA) (IRS) (ICE) (OTHER)